STATE OF IOWA ex rel. J. B. WEEDE, plaintiff, v. GEORGE M. BECHTEL, executor of last will of Martha R. Bechtel, et al., defendants; IOWA SOUTHERN UTILITIES COMPANY, a Delaware corporation, appellee; ELERY SCOTT, cross-petitioner-appellant; ILA FAYE THATCHER et al., intervenors-appellants; HAVNER & POWERS et al., applicants-appellants.

No. 47986.

(Reported in 56 N.W.2d 173)

DECEMBER 16, 1952.

REHEARING DENIED APRIL 10, 1953.

F. A. Ontjes, of Mason City, and Havner & Powers, of Des Moines, for intervenors and defendant-cross-petitioner, appellants.

Campbell & Campbell, of Newton, for Charles Morgan, administrator of estate of V. H. Morgan, deceased, and for Elery Scott, defendant-cross-petitioner, appellants.

F. A. Ontjes, of Mason City, Havner & Powers, of Des Moines, and John Hale, of Burlington, applicants-appellants.

Valentine & Valentine, of Centerville, Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, Cross & Hamill, of Newton, and Cook, Blair & Balluff, of Davenport, for appellee.

BLISS, J.—The prayer of the application is for judgment and decree against the Iowa Southern Utilities Company, for services rendered and expense disbursements made, for and in behalf of said company, by F. A. Ontjes, Havner* & Powers, V. H. Morgan, and John Hale, as attorneys for the intervenors and the defendant-cross-petitioner, in the institution of their actions and in the preparation for and the trial in the district court and on appeal in this court in the above entitled action, being cause No. 45458 in this court, reported in 231 Iowa 784, 2 N.W.2d 372, 4 N.W.2d 869, and No. 46686 in 239 Iowa 1298, 31 N.W.2d 853, 8 A. L. R.2d 1162. Recovery was also asked for expenses and for services rendered in resistance to petition to the Supreme Court of the United States for a writ of certiorari to the Supreme Court of Iowa filed by the Bechtels. Other defendants, among the "et al." in the title hereof, were Edward L. Shutts, president and treasurer and a director of the Iowa Southern Utilities Company since June 8, 1937, H. W. Deininger,

a vice-president since April 1938, D. D. Bentzinger, general manager, Celia Carson, executrix of the estate of George S. Carson, deceased, Davenport Bank & Trust Company, trustee under the will of George S. Carson, M. G. Stover, Charles Westbrook, and Elery Scott. The last three owned preferred stock in the Utilities Company at the time of the recapitalization of the Company and reclassification of its stock on or about August 1, 1938. George S. Carson, or his estate, owned approximately 2400 shares of preferred stock. George M. Bechtel had been chairman of the board of directors of the appellee since in 1934, and also a director. Harold R. Bechtel was secretary and a director and had been for many years.

The action originally was brought as a suit in equity under chapter 387 of the 1935 Code of Iowa, in the name of the State of Iowa on the relation of J. B. Weede, a citizen of Iowa, but not a stockholder of the company, who filed his petition in the district court of Jasper County, Iowa, on November 29, 1939. In this petition certain of the statutory provisions were referred to and their violation by the defendants was alleged. It was alleged: that certificates were issued without receiving par value therefor; that the new common stock issued under the recapitalization plan was void; that under said plan the exchange of the existing preferred and existing common stock for the new common stock as fixed by the officers, directors and others was all on an arbitrary basis without reference to the legal rights of any of the stockholders; that when this was done said officers, directors and others knew that a large part of the preferred stock had been issued without payment of par value, and knew that the 100,000 shares of common stock were worthless and without value and knew that the corporation had never received any value for said 100,000 shares of common stock; that to permit said officers and directors to continue in control of the corporation, its records and finances would defeat plaintiff's rights; and that a receiver should be appointed.

The prayer of the petition asked that the court determine what stock had been validly issued and what had been issued contrary to the statutes, and to declare the latter to be void, and that a receiver be appointed to take possession of the corporate

property and wind up its affairs. Other relief as might be equitable was prayed for. For a fuller statement of the petition and its prayer see the opinions in the appeals in this case as noted above.

On February 15, 1940, by leave of the court, there was filed in the case for the intervenors as parties defendant, by their said attorneys, an intervening answer. They alleged their joint ownership of seventeen shares of the 6% preferred stock of the Utilities Company, which they had not exchanged for the new common stock, and which they had bought directly from said company through its agents or employees and had paid the full par value therefor; that their stock was lawfully issued and is entitled to priority over all other stock issued by the corporation except such preferred stock as may be held by persons similarly situated to these intervening defendants, but have not joined herein.

Intervenors prayed in substance that their stock and that of stockholders similarly situated be decreed valid; that the voting rights of all stock be determined and that all stock illegally issued be decreed void and without right to vote; that the corporation be enjoined from making payments on dividend certificates; that a receiver be appointed, and for such other relief as might be equitable.

On December 7, 1942, intervenors amended their intervening answer by adopting the allegations of plaintiff's petition. On March 16, 1940, the court sustained motion of the Utilities Company to dismiss as to it plaintiff's cause of action, which ruling was reversed by this court on February 10, 1942, and the action was remanded for trial. On January 27, 1943, the court—Judge Graven presiding—overruled the motion of the Utilities Company to strike intervenors' answer, which was not thereafter attacked or replied to. The Carson estate filed substituted answer on February 25, 1943, praying dismissal of plaintiff's petition and an adjudication of the validity of their stock. The Utilities Company filed answer to plaintiff's petition denying that the 100,000 shares of old common stock, which had been exchanged for 39,468 shares of new stock, were worthless. The same attorneys who filed the answer of the company also filed

a joint answer to said petition, with substantially the same allegations as in the company's answer, for Martha R., George M. and Harold R. Bechtel, Edward L. Shutts, H. W. Deininger, D. D. Bentzinger, Elery Scott et al.

On March 1, 1943, Elery Scott, one of said joint defendants, who had exchanged seven shares of preferred stock, for which he had paid full par value, for new common stock, filed a substituted answer alleging that it was entitled to priority over all other stock of the company except such preferred stock as might be held by others situated similarly to him; admitting all allegations of plaintiff's petition except the allegation that his preferred stock was void. He also alleged that new common stock approximating $600,000 in par value had been issued for the company's old common stock, which was absolutely worthless, and without nominal or par value, and was subservient, as to dividends and assets, to the preferred stock held by himself and others "that paid honest money for their stock." He prayed that all stock illegally issued be declared void; that his preferred stock be returned; that the voting rights of the stock be determined; that a receiver be appointed and for general equitable relief. There was no attack upon or pleading to this answer. Plaintiff filed replies to answers of the company and of Bechtel et al.

Commencing on April 6, 1943, Judge Graven, with his reporter, and with Havner, Ontjes and Morgan appearing for plaintiff, and with power of attorney for Elery Scott, and with the Cook, Bradshaw, Valentine and Cross firms appearing for defendants, under an order to produce, held hearings steadily to August 6, 1943, at the company's establishment in Centerville, Iowa, in the examination of the books, papers and records of the company, pertinent to the action which had been remanded. Many thousands of items were examined. The reporter's transcript had 314 typewritten pages.

The trial of the case before Judge Graven began September 1, 1943, and continued with little interruption until January 19, 1944, at which time, at considerable length, Judge Graven orally announced his tentative conclusions as to what his decision would be, stating that the exchange of 39,468 shares of

the new common stock for 100,000 shares of the old common stock of the Bechtels which "was absolutely worthless" was a transaction which met the court's condemnation. The court also said: "We have intervenors here; true the plaintiff is not a stockholder, so far as that is concerned, but there are intervenors here and I think they have a right to protest against the $600,000 stock issue to the Bechtels."

On January 20, 1944, the court made its "Findings of Fact, Conclusions of Law, Judgment and Decree." The appearances noted were: Havner & Powers, F. A. Ontjes and V. H. Morgan for plaintiff; Cook, MacLaughlin & Blair, and the Valentine, Cross and Bradshaw firms, for the Utilities Company; Cook, MacLaughlin & Blair for Martha R., George M. and Harold R. Bechtel et al.; Cook, MacLaughlin & Blair and the Bradshaw, Valentine, and Cross firms for Edward L. Shutts, H. W. Deininger and D. D. Bentzinger. The following entered their appearance of record but did not appear and take part in the trial: Lane & Waterman for the Carson estate; Clark, Pryor, Hale & Plock, for Ila Faye Thatcher and Nancy Rosseau, intervenors; and Elery Scott appeared *pro se.*

The court in its "Findings of Fact, Conclusions of Law, Judgment and Decree" stated that the reclassification plan of August 1938 so far as the issuance of 39,468 shares of stock for the Bechtel common stock was unjust and unfair and inequitable as to former preferred stockholders represented by the intervenors Ila Faye Thatcher and Nancy Rosseau, and that the old common stock immediately prior to the reclassification was wholly worthless, and there was no consideration for the issuance of the 39,468 shares of new common stock, and said 39,468 shares were void and invalid and were so adjudged and should not be recognized as stock of the corporation or be reinstated; that the new common stock into which the preferred stock was converted constituted valid stock; that the allegations of plaintiff's petition were not sustained except as above noted.

Plaintiff had not intended to appeal and did so only after the Bechtels appealed. The printed matter on the appeal to this court and the rehearing consisted of 932 pages. On April 6, 1948, this court affirmed the district court, and denied the Bechtel petition for rehearing on November 19, 1948.

·The Bechtels filed petition for writ of certiorari in the October 1948 term of the Supreme Court of the United States against Ila Faye Thatcher, Nancy Rosseau, Elery Scott, and State of Iowa, respondents. Cook, Blair & Balluff appeared for petitioners and Havner & Powers and F. A. Ontjes for respondents. Printed briefs were filed and counsel for respondents reviewed the record with respect to a 600-page transcript filed by petitioners. The grounds urged for the writ were that the courts below had determined an issue that was outside the record, namely, the worthlessness of the common stock and the inequity and unfairness of its exchange for new common stock, and had failed to give full faith and credit to the laws of Delaware, all of which was in violation of petitioners' rights under the Constitution of the United States. The petition for the writ was denied May 31, 1949 (Bechtel v. Thatcher, 337 U. S. 918, 69 S. Ct. 1161, 93 L. Ed. 1728).

After the adoption of the stock reclassification plan at and subsequent to August 1, 1938, the 100,000 shares of common stock held by Martha R. Bechtel were converted into the 39,468 shares of new common stock which were registered in the name of George M. Bechtel as trustee for Martha R. Bechtel, but on April 25, 1940, the trustee transferred all of this stock to Martha R. Bechtel and it was registered in her name on the stock books. She then transferred much of this stock among her relatives, during the pendency of this litigation. All of this stock was so held after the decree of the district court on January 21, 1944, and until the denial of the writ of certiorari.

The dividends which accrued on these 39,468 shares were not paid to the holders of the shares, but the Utilities Company placed them in a special deposit in the First National Bank of Centerville, Iowa, which account was entitled "First National Bank—Special Deposit in Trust representing Common Dividends on 39,468 shares of Common Stock declared invalid in 'Weede' suit." Dividends deposited in this account from June 15, 1946 to May 31, 1949, when the writ of certiorari was denied, totaled $124,324.20. On the latter date the special deposit account was closed and said balance was restored to the company's surplus account and the 39,468 shares were taken out of the outstanding

stock, but the authorized capital stock of the company was not changed.

On February 8, 1950, the application for the allowance of counsel fees and disbursements, involved in the present appeal, was filed. It alleged the procedural steps taken in the litigation and the orders and decrees hereinbefore noted. Other allegations, in substance, were: that the services were performed by the firm of Havner & Powers, of Des Moines, consisting of H. M. Havner and B. J. Powers, the latter being the surviving partner since the death of Mr. Havner on July 31, 1949, F. A. Ontjes, of Mason City, V. H. Morgan, of Newton, who is deceased and is represented by Charles Morgan, the administrator of his estate, and John Hale, of the law firm of Clark, Pryor, Hale & Plock, of Burlington; that Ila Faye Thatcher, Nancy Rosseau and Elery Scott, defendant-cross-petitioner, were and are stock-holders of the Iowa Southern Utilities Company and employed the lawyer-applicants to represent them in the litigation; and alleged in pleadings in behalf of themselves, the Utilities Company and its stockholders in like situation to themselves, that approximately $600,000 par value of new common stock of the company was issued without consideration and wrongfully for the worthless old common stock, thereby making the issue of said stock void; that the Utilities Company, a Delaware corporation, was under the control of George M. Bechtel and Harold R. Bechtel and their associates; that under the reclassification plan the new common capital stock having a par value of $15 a share was issued for the outstanding old preferred stock and old common stock, and thereby 39,468 shares of new common stock, each with a par value of $15 and a total par value of $592,020 were issued to the Bechtels for 100,000 shares of old common stock having no value; that said attorneys, in behalf of their said clients, each rendered services in said litigation and made disbursements proper and necessary in said services as set out in the exhibits attached to the application; that both H. M. Havner and F. A. Ontjes were actively engaged in the trial of the action for about four and one-half months, and V. H. Morgan acted as local counsel; that on January 21, 1944, the court in its findings, conclusions and decree in favor of the intervenors and the

cross-petitioner-defendant stated that "the effect of this decision is to automatically increase the shares of these 4000 small stockholders about 11%, because the Bechtels owned 11% of the stock, and it also leaves these small stockholders in complete control of the corporation"; that the intervenors and Elery Scott filed and prosecuted the actions for the benefit of the corporation and all its stockholders other than the Bechtels, and the court's cancellation of the 39,468 shares of new common stock has benefited the company and all stockholders in like position to intervenors and Scott in a proportionately equal amount; and that the services of the applicants in procuring said benefits are reasonably worth $200,000. Judgment was prayed against the Utilities Company for said sum as just compensation for said services together with such sums as would fairly compensate applicants for their proper expenditures.

On March 1, 1950, a special appearance was filed by the Utilities Company questioning the jurisdiction of the trial court, which stated as grounds therefor that: judgment was entered on January 21, 1944, in its favor for costs and with no relief against it, and denying any relief to the State of Iowa ex rel. Weede, and that no motion for an allowance of attorneys' fees or expenses was made during the trial or at the entry of judgment or during the term of court at which judgment was entered; that the trial court reserved no jurisdiction at the time of judgment for any purpose, and during the remainder of the December 1943 term of court there was no modification of the judgment nor any request therefor, and upon the expiration of the term on or before February 6, 1944, the trial court lost jurisdiction of the cause and of the parties; that the judgment was affirmed on the appeals of the plaintiff and of the Bechtels, and the cause was not remanded for further proceedings in the district court on November 21, 1948, a day of the September 1948 term, which thereafter expired by law, without any modification of the judgment or application therefor. On June 8, 1950, the district court overruled the special appearance and on July 27, 1950, the supreme court denied defendant's application for an interlocutory appeal from the overruling of the special appearance.

On August 15, 1950, defendant filed answer to the applica-

tion for attorneys' fees and expenses in five divisions containing thirty-nine paragraphs. We will not attempt to summarize the allegations of the answer or of the applicants' reply as the matters in each which are stressed in the arguments appear hereinafter.

In support of the allegations of their application and reply applicants introduced competent evidence that the market value of defendant's new common stock on May 31, 1949, immediately following the denial of the writ of certiorari, terminating the litigation, was between $13.50 and $14 a share. No testimony to the contrary was introduced.

The assistant secretary and assistant treasurer of the defendant testified, as a witness for applicants, that up to May 31, 1949, the number of outstanding shares of the common capital stock was 358,799.1, and the money value of it at $15 a share, par value, was $5,381,986.50, and that said valuation was not changed after the court's decision. He testified: "The number of shares shown outstanding is different but we left the same value on the books, although the total number of shares outstanding is less. The equity of shares increased that much, the difference, increased that much in value."

Ila Faye Thatcher, intervenor, a witness for applicants, testified, in substance, that: she was a schoolteacher at Promise City, Iowa; her grandmother, Nancy Rosseau, now deceased, was the other intervenor; seventeen shares of 6% cumulative preferred stock were issued to them January 4, 1932, "as joint tenants * * * with complete ownership in survivor"; she had known of Mr. Havner many years; he had first talked to her father, Robert Thatcher, and she and her grandmother talked with him in January 1940; there were unpaid dividends on their stock and they had been told when they bought the stock that they could get their money back at any time, but this had been refused them; she and her grandmother delivered their stock to Mr. Havner at this time and told him to do whatever he saw fit and necessary; Mr. Havner said it would be necessary for him to get other legal help, and mentioned John Hale, and she and her grandmother told him to get anybody he desired, and later he told her he proposed to get Fred Ontjes to assist

him; he made reports to them from time to time, in one of which he told them of his employment of Mr. Hale and Mr. Ontjes. Robert Thatcher, who knew Mr. Havner when they were students at Simpson College, testifying for applicants, corroborated the testimony of his daughter as did Lillian Kanealy who was present in the Thatcher home when the conversation between Mr. Havner and the intervenors took place.

John Hale, one of the applicants, as a witness for them testified that: he had known Mr. Havner very well, and had been associated with him in a case; following the adoption of the stock reclassification plan by the Utilities Company of August 1, 1938, an investment banker at Burlington, who had sold considerable stock of the Utilities Company, told him there had been much dissatisfaction among his customers over the plan, and he sent many of them to the office of Clark, Pryor, Hale & Plock to see what could be done; that as a result plans were discussed about organizing a stockholders' protective committee and to start a stockholders' derivative action, and he conferred with Mr. Havner about it, and as a result the intervenors consulted him, and on February 15, 1940, his firm filed the intervening action for them; that later he had many conferences with Mr. Havner and with Mr. Ontjes who later came into the case; he told them he would give them what help he could in the case but he preferred not to take active part in the trial, and it was agreed that Mr. Havner and Mr. Ontjes would take active charge of the case and look after the interests of the intervenors and present evidence in their behalf; he had a number of conferences with them, though he was in court during the trial very little.

F. A. Ontjes testified that he came into the case in December 1942 with Mr. Havner and Mr. Hale as attorneys for intervenor, and also for the relator; that about March 1, 1943, Mr. Elery Scott was present at Newton at some hearings in the action with Mr. V. H. Morgan and asked that a change be made in the answer that had been filed jointly for him and other defendants by Attorneys Cross and Hamill, and that Mr. Havner and he (Mr. Ontjes) drew a substituted answer, which, in effect, was a cross-petition, with respect to the fraudulent issue of new com-

mon stock for worthless old common stock, which answer Mr.
Scott signed and asked them (Havner, Ontjes and Morgan) to
look after his interests and the interests of other stockholders,
and they agreed to do so; later, and on April 28, 1943, Mr. Scott
gave them written authority to proceed as counsel for himself
and others in the proceedings at Centerville for examining the
company's books and records. Mr. Ontjes also testified: that in
the summer of 1943 he and Mr. Havner called at the home of
the intervenors to meet them, and Mr. Havner told them of his
(Ontjes') employment as attorney in the case, which was agree-
able to them; that it was agreed with Mr. Hale that Havner and
he (Ontjes) would represent the intervenors and their interests
in the trial and present evidence for them and argue their case,
and that Mr. Hale need not be present in court; that Mr. Havner
and Mr. Morgan and he did so represent the intervenors and Mr.
Scott in the trial court, and made oral and written arguments for
them in the Supreme Court of Iowa on appeal and rehearing,
and also filed resistance for them in the certiorari proceedings in
the Supreme Court of the United States.

Mr. Ontjes went through the more than 2800 pages of the
reporter's transcript of the trial and marked such parts of it
as in his judgment bore upon the issues in the case of the
intervenors and Mr. Scott. It was the opinion of the witness
that in the production examination about 50% thereof was de-
voted to those issues, in the district court trial about 25% to
30% thereof, in the Iowa Supreme Court about 75% to 80%,
and in the United States Supreme Court about 100% of their
time and efforts were devoted to such issues.

In support of Exhibits "A", "B", "C", and "D", attached
to the application, and being itemized statements of time spent
and expense incurred respectively by Havner & Powers, F. A.
Ontjes, John Hale and V. H. Morgan, the original books of
entry from each law office were introduced in evidence and the
respective secretaries and bookkeepers who made the entries
testified to their correctness. The trial court found them to be
true and correct.

Defendant offered in evidence, and read much of it into the
record, a 69-page transcript of the record of a suit in equity,

800

entitled State of Iowa ex rel. Lola G. Landes and S. S. Wright v. The Iowa Southern Utilities Company of Delaware, brought in the District Court of Keokuk County, Iowa, on or about December 8, 1938, later removed to the District Court of the United States for the Southern District of Iowa—Ottumwa Division—where it was dismissed by the plaintiff without prejudice to all parties, with the consent of the court, on July 14, 1939.

Mr. V. D. Welch, assistant secretary and assistant treasurer of the defendant, testified in its behalf concerning the changes in the company's shareholders, there being about 2200 stockholders in March 1950 who were not stockholders in March 1944; the time and service spent by him and other corporate officers and employees because of this litigation, in particular, he testified: "I was present at Newton during the trial of this case in 1943 and 1944. I was a witness and helped to prepare the exhibits and look after the Iowa Southern records that were here. We shipped, I am sure, many hundreds of records up here, an entire big truck load at the opening of the trial and later we brought considerable more records as the trial progressed." He testified that because of these extra duties it was impossible for him to perform his regular work, and that Edward L. Shutts put in a substantial part of his time with work connected with this litigation. He testified that on January 21, 1944, according to the Chicago Journal of Commerce, the quotations of the Iowa Southern Utilities Company's new common stock were "bid, $\frac{6}{8}$ dollars per share and asked $7\frac{1}{8}$ dollars per share."

Edward L. Shutts, president and treasurer of the defendant since June 1937, testified for defendant to the long hours he spent laboring for defendants in this litigation. On direct examination he was asked if he had an opinion that the litigation had been detrimental to the defendant. Over objection, he answered: "It has been definitely damaging to the corporation. Q. Do you have any opinion as to the extent of that damage, what the litigation has directly or indirectly cost the company?" Over objection, Mr. Shutts answered: "Well, Mr. Cook, I couldn't give you any estimate of the amount of damage. That is something that no such estimate can be made." Asked whether the corporation received any financial benefit in the canceling of the 39,468 shares he answered that he could not see that it had.

Mr. Shutts conceded that the restoring of the special deposit of dividends on the canceled stock to the company's general fund "was certainly of benefit to the company." He testified that neither he nor any other officer or director of the company made any effort looking to the cancellation of the 39,468 shares of Bechtel stock.

On November 10, 1950, the trial court filed its findings of fact and conclusions of law, consisting of fifty-six paragraphs, and covering twenty-two pages of the printed record. Many of the findings of fact relate to matters about which there was no controversy. In general, on the controverted issues, the court sustained the contentions of the defendant and the allegations of the answer.

We do not agree with the court's findings on the controversial facts, nor its conclusions of law, nor its judgment disallowing all recovery to applicants, and for taxing all costs against them.

I. This appeal is the fourth one in this court involving various intracorporate abuses in the operation of the Iowa Southern Utilities Company of Delaware. The first appeal was in this action and may be found in 231 Iowa 784 (February 10, 1942), supra. The second appeal in the same action is in 239 Iowa 1298 (April 6, 1948), supra. The third appeal was in Des Moines Bk. & Tr. Co., special administrator of estate of Lola G. Landes, deceased, v. George M. Bechtel & Co., 243 Iowa 1007, 51 N.W.2d 174, decided January 8, 1952, in which a petition for rehearing by the defendants was denied. A certified copy of much of the record in an earlier case was introduced by defendant in the court below in the proceedings in the appeal at bar. That case was State of Iowa ex rel. Lola G. Landes and S. S. Wright v. The Iowa Southern Utilities Company of Delaware, brought in the District Court of Keokuk County, Iowa, and after removal to the District Court of the United States was dismissed by plaintiff. The relators in that case respectively owned preferred stock in the defending corporation in the par value amount of $10,000 and $3400. The nature of the case last noted was substantially the same as State of Iowa ex rel. J. B. Weede v. Iowa Southern Util. Co., supra, 231 Iowa 784.

S. S. Wright, long a Polk County district court reporter, and his wife each brought an action at law against the Iowa Southern Utilities Company on an oral contract of the defendant to repurchase from them preferred stock of the defendant which it had sold to them. The opinions on appeal are respectively in 230 Iowa 838, 298 N.W. 790, and 230 Iowa 844, 298 N.W. 794, and show the plaintiffs procured reversals. In all of the cases noted above, the law firm, of which H. M. Havner was at all times the senior member, represented the prosecution. One or more of the law. firms appearing for defendant in the proceeding at bar appeared for the defense in each of the cited cases.

■ It is clear from the record before us that it was because of the relationship of Mr. Havner to said litigation that the defendant in its brief and argument on this appeal, states as a defense: "The action was not brought or prosecuted in good faith to benefit the corporation and its stockholders." It was that spirit which was the motivation for the following allegation in Division V of defendant's answer:

"The defendant * * * further alleges the following facts, as grounds for defense and basis for denial of the claim made by the applicants:

"33. That the litigation leading to the presently disputed claim and all services rendered by the applicants in connection therewith constituted a 'strike suit', having been instituted and prosecuted by the applicants not in good faith, but for the purpose of harassing and embarrassing the defendant corporation, in the hope of gaining some settlement advantageous to the applicants, or to force the defendant corporation into an operating receivership which the applicants might manage and control; and the alleged benefit to the defendant corporation claimed in the application was a result quite incidental to the applicants' endeavors in the prosecution on their own behalf of the said 'strike suit', which suit was adverse to the interests of the defendant corporation and its stockholders.

"34. That the litigation leading to the presently disputed claim was initially instituted and principally aimed at forcing the defendant corporation into receivership * * *."

Of John Hale, who drafted the intervening answer for Miss Thatcher and her grandmother, defendant alleged in paragraph 37 of its answer that "in every respect the applicant, John Hale, joined with the other applicants in the prosecution of their attack upon the defendant corporation."

Under the heading "THE MATTER OF GOOD FAITH" it is stated in the printed argument:

"It was contended by the defendant Iowa Southern Utilities Company of Delaware that the original action was not only adverse to the corporation and the great mass of its stockholders, but that it was brought as a 'strike suit' to harass and damage the corporation, and that it had that effect. As bearing on this contention, and as showing the true nature and purpose of the suit, other litigation begun by the same counsel who now claim fees for the benefits bestowed becomes important. The record shows that on December 9, 1938, Mr. Havner, as attorney for Lola G. Landes, a holder of preferred stock who had opposed the reclassification, together with Seth Wright (who also sued the company on what he claimed was an agreement to repurchase his stock) brought an action in the name of the State of Iowa against the Iowa Southern [Utilities Company] in the District Court of Keokuk County on allegations quite similar to those in the case of State ex rel. Weede."

The charge of bad faith in the prosecution of the litigation was expressly made by defendant against not only H. M. Havner, then deceased, but against Miss Ila Faye Thatcher, schoolteacher, her grandmother, Nancy Rosseau, and Elery Scott, and the other attorneys who represented them. The same charge is inferentially made against Lola G. Landes, deceased, and Seth Wright and wife.

What is a "strike suit"? It is a name which has been given to litigation instituted for its nuisance value by persons who have purchased a few shares of stock in a corporation, in which officers or directors have breached or are suspected of breaching their fiduciary obligations, with the purpose on the part of the purchasers of prosecuting a stockholders' suit against the guilty fiduciaries and the corporation, trusting that those fiduciaries

will make a settlement rather than suffer the embarrassment of exposure.

These so-called "strike suits", however, are the comparatively rare exceptions as compared to the great number of legitimate stockholders' suits which have been a most wholesome, though inadequate, remedy in deterring these intracorporate transgressions by officers and directors, and in recovering for the corporations assets which have been thus wrongfully plundered. As said by Mr. Justice Jackson in Koster v. (American) Lumbermens Mut. Cas. Co., 330 U. S. 518, 522, 67 S. Ct. 828, 830, 91 L. Ed. 1067, 1072, 1073:

"The stockholder's derivative action, to which this policyholder's action is analogous, is an invention of equity to supply the want of an adequate remedy at law to redress breaches of fiduciary duty by corporate managers. Usually the wrongdoing officers also possess the control which enables them to suppress any effort by the corporate entity to remedy such wrongs. Equity therefore traditionally entertains the derivative or secondary action by which a single stockholder may sue in the corporation's right when he shows that the corporation on proper demand has refused to pursue a remedy, or shows facts that demonstrate the futility of such a request. * * * The cause of action which such a plaintiff brings before the court is not his own but the corporation's. It is the real party in interest and he is allowed to act in protection of its interest somewhat as a 'next friend' might do for an individual, because it is disabled from protecting itself."

In Cohen v. Beneficial Industrial Loan Corp., 337 U. S. 541, 548, 69 S. Ct. 1221, 1226, 93 L. Ed. 1528, 1537, Mr. Justice Jackson, again speaking for the court, said:

"Equity came to the relief of the stockholder, who had no standing to bring civil action at law against faithless directors and managers. Equity, however, allowed him to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own. * * * This remedy, born of stockholder helplessness, was long the chief regulator of corporate management and has afforded no small incentive to avoid at

least grosser forms of betrayal of stockholders' interests. It is argued, and not without reason, that without it there would be little practical check on such abuses.

"Unfortunately, the remedy itself provided opportunity for abuse, which was not neglected. Suits sometimes were brought not to redress real wrongs, but to realize upon their nuisance value. They were bought off by secret settlements in which any wrongs to the general body of share owners were compounded by the suing stockholder, who was mollified by payments from corporate assets. These litigations were aptly characterized in professional slang as 'strike suits.' * * * We need not determine the measure of these abuses or the evils they produced on the one hand or prevented and redressed on the other."

The prevalence of these abuses by disloyal corporate managers has resulted in a great volume of stockholders' suits. In many of them it has been a stock defense for the accused malfeasors to recriminate with the charge that the action is a "strike suit."

Professor George D. Hornstein, of Columbia University, has made a very extensive study of stockholders' suits and his treatises on various phases of the subject have been frequently cited in the law reports. Several of them are referred to by Mr. Justice Jackson in a footnote in 93 L. Ed. 1528, 1538. (Problems of Procedure in Stockholders' Derivative Suits (1942) 42 Columbia L. Rev. 574; Hornstein, Directors' Expenses in Stockholders' Suits (1943) 43 Col. L. Rev. 301; Hornstein, New Aspects of Stockholders' Derivative Suits (1947) 47 Col. L. Rev. 1; Hornstein, the Death Knell of Stockholders' Derivative Suits in New York, 32 Cal. L. Rev. 123.

Another article is Hornstein, The Counsel Fee in Stockholder's Derivative Suits (1939) 39 Columbia L. Rev. 784–816. In it the author states at pages 784, 785: "Court records are replete with illustrations of intracorporate abuse. * * * An essential of stock ownership is the right to have the corporate assets employed in the collective interest of the group. But corporations offer a great temptation to those in control to employ the corporate resources for their own benefit. Jhering [Der Zweck

Im Recht] pointed out that the status of an administrator (manager, director) of group property is the most dangerous to society of any known to the law. * * * The courts, realizing the need for equitable control, have uniformly held that if a corporation has been injured and should sue, but refuses to sue, or is under the control of those who have wronged it, a stockholder may maintain a suit in equity on behalf of the corporation. * * * [page 786] It must not be forgotten that the frequent disclosure of corporate scandals testifies to the inadequacy of the stockholder's suit as a means of keeping corporate stewards honest. But until the stockholder's suit is supplemented with an effective preventive device, such as the application of criminal sanctions, the suit is society's principal safeguard. It appears probable that the civil courts will continue to be relied upon for redress when directors, officers, and others dealing with the corporate assets threaten to act or have acted contrary to just and equitable principles."

After referring to the rule in equity that "when a party institutes litigation which creates, increases, or protects a fund or property for the benefit of a class of which he is a member, i.e., salvages assets which others will share, the fund or property should be charged with the necessary expenses incurred in the litigation" and citing (page 787) the leading case applying this principle, Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157, the author continues at page 788: "It was inevitable that the principle applied in a representative suit by a creditor or bondholder should also be applied in a suit by a stockholder. * * * if a stockholder sues on behalf of all the stockholders, for the benefit of his corporation, and if his suit is successful and the corporation benefits thereby, the complaining stockholder is entitled to reimbursement for all proper expenditures made or liabilities necessarily incurred in the prosecution of the suit. * * * [page 790] In a stockholder's suit the court's reasoning is that the action having been sustained, it necessarily follows that it should have been brought by the corporation, and it is equitable that the plaintiff be reimbursed for the expenses which the corporation would have incurred had it performed its duty to the stockholders by bringing the action itself. * * * [pages

791, 792] Assuring a stockholder that, if successful, he will not be obliged personally to pay the entire cost of the suit is hardly too much inducement. He still takes all the hazards of defeat and even if successful gains no advantage greater than that of any of his fellow-stockholders who sat by and did nothing. Nor does he recover anything for personal services or personal expenses. Few stockholders will take action even after wrongs are disclosed. Some are friendly to, if not actually in league with, the management. * * * Small stockholders in large corporations may collectively own a majority of the stock, but most of them, with a few shares, are passive. A small investment does not justify an additional outlay which may throw good money after bad."

Footnote 57 of the page states: "Nor will the suit be encouraged by the realization that the litigant will be labeled a 'striker' or 'exhorter'—characterizations which not only have an effect on the court in the immediate case but are in fact an ingredient of carefully planned propaganda to discourage this type of litigation. See note (1934) 34 Columbia Law Rev. 1308. The technique has been exposed as a regular defense strategy in reorganization cases. Senate Document No. 268, 74th Cong., 2d Sess. (1936) 27."

The only evidence which defendant offered in support of its allegation of bad faith on the part of the intervenors was the transcript in the Keokuk County case. There is no other evidence on this issue. We are not impressed with defendant's conclusion and contention therefrom that these two ladies—one a schoolteacher, the other a grandmother—bought these few shares of stock back in 1932 from the defendant and paid $100 a share in cash for them (they were selling far below par on the market, and the 6% dividend had not been paid on the stock in 1931 or 1932 and never thereafter was paid at full rate) on the promise from the defendant at the time that it would repurchase the stock at any time they asked for it at $98 a share—which it refused to do—and at the time the purchase was made they did so with the evil purpose of "holding up" the defendant by instituting a "strike suit" eight years later in 1940.

There is just as little reason for charging Elery Scott with

bad faith. He being a resident of Jasper County, where the suit was brought, may have been made a defendant for that reason. The attorneys for the company and the Bechtels included him in the joint answer. Later he was not satisfied with this procedure and filed an answer which adopted many allegations of the petition. We are not convinced that he did it in bad faith or with the intention of instituting a "strike suit."

While all of the applicants are charged with complicity in the "strike suit" or "suits", if the intervention and the pleading of Elery Scott be considered separately, H. M. Havner is regarded by the defendant as the person who instigated and prosecuted the "strike suits." The Keokuk County suit was instituted by Lola G. Landes and Mr. and Mrs. Seth Wright. They were persons of maturity who had acquired property. The first named invested $10,000 and the Wrights invested $3400 in preferred stock of the defendant. They and the intervenors were opposed to the company's reclassification plan and never exchanged their stock. George M. Bechtel aided by his son, Harold, dominated the other directors of the defendant and completely controlled its operation greatly to its disadvantage and to the benefit of the Bechtels. The nature and extent of these transactions were not disclosed to the public or to its stockholders and were not to be found in the records of the corporation. It was the policy of the officers and directors of the company to permit no stockholder or anyone else to examine the company records. Some information of the affairs of the company and its relations with the Bechtels was made known in the Bechtel bankruptcy proceedings, and in matters leading up to the adoption of the recapitalization amendment. The petition filed in the Keokuk County case indicates on its face that Lola Landes and the Wrights and their attorneys, Havner, Flick & Powers and V. H. Morgan, had little knowledge of how the Bechtels had operated the Utilities Company. That suit was dismissed and the suit was brought on the relation of J. B. Weede, who was not a stockholder of defendant. He permitted his name to be used because Lola G. Landes agreed to relieve him of all expense in the prosecution of the suit. The allegations of the petition indicate no greater knowledge of the operations

and transactions of the company than appeared in the petition in the Keokuk case. Tangible evidence of those operations was not disclosed until the books, papers and records of the company were made available to the attorneys for the plaintiff by later orders of the court. Many of the matters thereby discovered are discussed in the opinion in Des Moines Bank & Trust Co. v. George M. Bechtel & Co., 243 Iowa 1007, 51 N.W.2d 174, supra. They establish beyond question that although at the times when the Landes case and the Weede case were begun the relators and their attorneys had no definite knowledge of the facts involved, nevertheless there existed at all pertinent times facts fully justifying the prosecution of the actions and the relief prayed for. We find no merit in defendant's allegation that the actions noted were not begun and maintained in good faith by each and all of the applicants.

II. Defendant contends that "the action was not brought for or on behalf of the corporation or for its benefit, but was definitely adverse to it and to an overwhelming majority of its stockholders; that insofar as the relator-plaintiff is concerned the action was brought and prosecuted under a statute expressly requiring it to be maintained at the cost and expense of the relator; and that insofar as the intervenors and the defendant, Scott, sought to defend against a claim that their stock was void and to have it established as valid, their action was for their own benefit or, at most, for the benefit only of the holders of unsurrendered preferred certificates. There was no privity of contract between them and the corporation or the stockholders generally."

The applicants concede that they are entitled to fees and expenses for services rendered in the action brought by the State of Iowa on the relation of J. B. Weede, only in so far as the services rendered and expenses incurred were related to the intervenors' answer as amended and the substituted answer, referred to as in effect a cross-petition, of Elery Scott, which pleadings were filed by them as stockholders of the defendant, and as stockholders' actions for the benefit of the defendant, and by them as representatives of defendant and its stockholders similarly situated to the pleaders. The applicants are asking

recompense for their services rendered and reimbursement for expenditures they made for the benefit of the defendant in the recovery of and the restoration to it of corporate assets wrongfully acquired by the Bechtels, as decreed by the court under the answer of intervenors and the so-called cross-petition of Elery Scott. It is the contention of applicants that the acquisition of the 39,468 shares of new common stock in return for the worthless old common stock of the Bechtels in a way which the court described as *particeps criminis,* or participation in crime, was a wrong against the defendant corporation which was its right and its duty to remedy by appropriate action; and that it was not a wrong against the intervenors or Scott or any other stockholder, except remotely and indirectly, nor a right which they could enforce by an action in their own behalf, but in the event the defendant refused or failed to take proper corporate action then the intervenors or Scott or any other stockholder would have the right to institute an action in behalf of the corporation and as its representative and as representative of all other stockholders. It is the contention of the applicants that the intervention of Thatcher and Rosseau and the cross-petition of Scott were filed solely in such representative capacity and the relief granted by court was to the corporation in the cancellation and return to it of 39,468 shares of stock which should never have been issued.

The intervenors alleged that they paid par for their stock and that it was valid. They prayed that the court determine which stock was valid and which was invalid and that all stock issued for full par value, as theirs had been, should be declared valid. The prayer of Scott was to the same effect. He specifically alleged that $600,000 of new common stock was issued for the worthless old common stock. The court granted the relief as prayed.

■■■ The intervenors and Scott did not inject themselves into the statutory case of the relator-plaintiff to sue for any relief personal to themselves. It is true, of course, that a stockholder may have an individual cause of action against his corporation in which no other stockholder has any interest. He may sue the corporation on an express or an implied contract which he has

with it. He may sue it on a tort claim for damages suffered by him for injury inflicted on his person or property by the corporation. He may sue it because it refuses to issue to him certificates of stock which he has bought and paid for, or to transfer on its records and stock books certificates of stock assigned to him. He may have many other causes of action strictly personal to himself.

But when an officer or director or even a stranger to the corporation wrongfully takes its property, or injures it in any way, the wrong done is to the corporation, and any right of action belongs to it. It is true that any wrong to the corporation necessarily injures every stockholder, and every recovery by the corporation for such wrong necessarily benefits every stockholder. This is true because the stockholders are in reality the corporation. But no stockholder can sue for his proportionate share of the wrong done to him individually or for his personal proportionate share of any recovery or remuneration which the corporation may receive for the injury. When the wrong suffered by a stockholder is proportionately the same as that suffered by every other stockholder the wrong is a corporate one for which the corporation must bring action. If every stockholder should sue there would be a multiplicity of actions which a court of equity would not tolerate. It is only when the corporation refuses or neglects to bring action for the wrong or injury that equity permits a stockholder, as a representative of the corporation and of all other stockholders, and for the primary benefit of the corporation, and the secondary, indirect and derivative benefit of stockholders similarly situated, to bring action in his name. Such an action is known as a stockholders' derivative or representative action, in which the corporation is made a nominal defendant though it is in fact the real plaintiff in interest. It is such an action that the intervenors and cross-petitioner have brought. It is for the benefit of the corporation and to restore that which was wrongfully taken from it.

The legal principles involved in actions of this nature are well settled in this state and elsewhere. They are ably discussed by Chief Justice Ladd in Graham v. Dubuque Specialty Machine Works, 138 Iowa 456, 461, 114 N.W. 619, 621, 15 L. R. A., N.S.,

729, and the court quotes with approval from 3 Pomeroy, Eq. Jur., section 1095: "* * * 'but it is absolutely indispensable that the corporation itself should be joined as a party—usually as a codefendant. The rationale of this rule should not be misapprehended. The stockholder does not bring such a suit because his rights have been directly violated, or because the cause of action is his, or because he is entitled to the relief sought; he is permitted to sue in this manner simply in order to set in motion the judicial machinery of the court. The stockholder, either individually or as the representative of the class, may commence the suit, and may prosecute it to judgment; but in every other respect the action is the ordinary one brought by the corporation, is maintained directly for the benefit of the corporation, and the final relief, when obtained, belongs to the corporation, and not to the stockholder—plaintiff. The corporation is, therefore, an indispensably necessary party, not simply on the general principles of equity pleading in order that it may be bound by the decree, but in order that the relief, when granted, may be awarded to it, as a party to the record, by the decree. This view completely answers the objections which are sometimes raised in suits of this class, that the plaintiff has no interest in the subject-matter of the controversy nor in the relief. In fact, the plaintiff has no direct interest; the defendant corporation alone has any direct interest; the plaintiff is permitted, notwithstanding his want of interest, to maintain the action solely to prevent an otherwise complete failure of justice.' "

The fact that the plaintiff in such suit is a stockholder of the corporation is sufficient to qualify him as one entitled to bring action. The opinion further states (page 462): "Nor are the expenses of litigation allowed the shareholder on the theory that he has acted as the agent of the corporation in what he has done. The action is, to all intents and purposes, the suit of the corporation, and is for the benefit of all parties interested to protect a trust fund, and on this ground the stockholder is reimbursed from such fund for all proper expenditures made or liabilities incurred." Quoting from 2 Spelling on Private Corporations, section 643, the court said: "* * * 'the owner of stock * * * who sues for himself and all other shareholders suc-

cessfully, for a wrong done to the corporation, is entitled to be reimbursed his actual and necessary expenses and expenditures, including attorney's fees out of the corporate fund.' In Cook on Stock and Stockholders, section 748, it is said that, in case the suit is successful, the complaining stockholder is entitled to have his costs paid by the corporation." The opinion also quotes from Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157, and cites numerous other authorities.

Many authorities might be cited in support of the principles of law above-stated. See: Ballantine on Corporations (Rev. Ed. 1946) chapter XI; 13 Fletcher Cyclopedia of the Law of Private Corporations, chapter 58, Division XXXIII, section 5939 et seq.; Ontjes v. MacNider, 234 Iowa 208, 215–222, 12 N.W. 2d 284; Sprague v. Ticonic Nat. Bk., 307 U. S. 161, 59 S. Ct. 777, 83 L. Ed. 1184; Price v. Gurney, 324 U. S. 100, 65 S. Ct. 513, 89 L. Ed. 776; Magale v. Fomby, 132 Ark. 289, 201 S.W. 278, 279; Goodbody v. Delaney, 80 N. J. Eq. 417, 83 A.988; Liken v. Shaffer (N. D. Iowa) 64 F. Supp. 432–442, and many cases cited; R. H. Mc-Williams, Jr., Co. v. Missouri–Kansas Pipe Line Co. (two cases) 21 Del. Ch. 308, 190 A.569; Colley v. Wolcott, 8 Cir., Kan., 187 F. 595; Meeker v. Winthrop Iron Co., 17 F. 48; Gettinger v. Heaney, 220 Ala. 613, 127 So. 195, 198; Goodliffe v. Colonial Corp., 107 Utah 488, 155 P.2d 177; Wood v. Union Gospel Church Bldg. Assn., 63 Wis. 9, 22 N.W. 756, 758; Potter (Wangrow, intervenor) v. Walker, 252 App. Div. 244, 293 N. Y. S. 161, affirmed 276 N. Y. 15, 11 N.E.2d 335; 18 C. J. S., Corporations, section 248, page 701 (the issue of invalid stock is a wrong against the corporation and other stockholders); 18 C. J. S., Corporations, section 252, page 707 (primarily the right to cancel stock issued fraudulently and without consideration is in the corporation); Schoenherr v. Van Meter, 215 N. Y. 548, 552, 109 N.E. 625, 626, wherein Mr. Justice Cardozo said: "The plaintiff rendered services of value, which the corporation has appropriated without requital. The plastic remedy of an equitable lien is adequate in such a case to prevent a failure of justice." Also Boyd v. Bell, 64 F. Supp. 22; Slutzker v. Rieber, 132 N. J. Eq. 412, 28 A.2d 528; Mann v. Luke, 44 N. Y. S.2d 202; Masholie v. Salvator, 182 Misc. 523, 46 N. Y. S.2d 596; Holthusen v. Budd

Mfg. Co., 55 F. Supp. 945; Georgia Veneer & Package Co. v. Florida Nat. Bk., 198 Ga. 591, 32 S.E.2d 465; Gildener v. Lynch, 184 Misc. 427, 54 N. Y. S.2d 827; Perrine v. Pennroad Corp., 28 Del. Ch. 342, 43 A.2d 721, affirmed Del. Sup. Ct., 47 A.2d 479, and 29 Del. Ch. 423, 51 A.2d 327; Swacker v. Pennroad Corp., Del. Sup. Ct., 57 A.2d 63 (In the Pennroad Corporation litigation a settlement was made for $15,000,000 of which $3,000,-000 was set aside for payment of counsel fees and expenses.); Winkelman v. General Motors Corp., 48 F. Supp. 504, 506, affirmed Singer v. General Motors Corp., 136 F.2d 905; Neuberger v. Barrett, 180 Misc. 222, 39 N. Y. S.2d 575; Diamond v. Davis, 62 N. Y. S.2d 175; Hawes v. City of Oakland, 104 U. S. 450, 26 L. Ed. 827; Overfield v. Pennroad Corp., 48 F. Supp. 1008, 1018, modified 146 F.2d 889; Southern Ry. Co. v. Peck, 178 Misc. 638, 34 N. Y. S.2d 370; New York Central Ry. Co. v. New York & Harlem R. Co. (May 26, 1950) 301 N. Y. 567, 93 N.E.2d 451, 452; Shillito v. City of Spartanburg, 214 S. C. 11, 24, 51 S.E.2d 95, 100, 5 A. L. R.2d 863, 869 (The court said: "The underlying principle in cases brought in equity authorizing the payment of an attorney's fee in a class action generally has to do with a common fund owned by the litigants * * *. This principle, however, is not solely confined * * * to what is usually termed a 'common fund.' "); Byshcim v. Miranda, 45 N. Y. S.2d 473, 475 (The court said: "The court cannot subscribe to the narrow view that the creation or production of a fund is a *sine qua non* for an award of compensation. The principle on which allowances in derivative actions are made is that those who share in a benefit produced by one of their number should justly share in the expense producing that benefit. Under that principle it is manifest that the award depends upon the production of the benefit and not upon the form that the benefit may take. That benefit may be in the form of the creation of a fund or the reduction or cancellation of a debt. It may be in the form of the prevention of a loss or the defeat of an adverse claim."); Abrams v. Textile Realty Corp., 97 N. Y. S.2d 492, 498: "Furthermore, on an issue such as this (as said in Hornstein, The Counsel Fee in Stockholder's Derivative Suits, 39 Col. L. Rev. 784, 789): 'The court considers the basic interest common to all sharers

in the fund and disregards a hostility of interest of individual members of the class; and recovery is never denied simply because certain members of the class are, as a practical matter, adversely affected by the complainant's successful action.' "); Lamont v. Travelers Ins. Co., 272 App. Div. 882, 71 N. Y. S.2d 211; United States v. Anglin & Stevenson, 10 Cir., Okla., 145 F.2d 622, 630 (The court said: "The allowance of 25% of the amount recovered is well within the proof adduced on this record in support of a reasonable attorney's fee."); Guardian Trust Co. v. Kansas City Southern Ry. Co., 8 Cir., Mo., 28 F.2d 233, affirmed 281 U. S. 1, 50 S. Ct. 194, 74 L. Ed. 659; O'Hara v. Oakland County, 6 Cir., Mich., 136 F.2d 152, 155 (There was extended litigation. A fund of $133,030.35 resulted. An attorney's fee of $30,000 was allowed by the special master. In affirming the Circuit Court of Appeals said: "The allowance does not depend upon whether petitioner's clients, Oakland Hills, and Oakland County, were aligned in interest upon the same or opposite sides of the litigation, or upon whether petitioner's application was made by him directly to the court or through his client, or whether the litigation was by classes or otherwise; or in what particular manner the fund was created. These were all mere formalities."); Washington Gas Light Co. v. Baker (U. S. Court of Appeals, District of Columbia, October 29, 1951) 90 App. D. C. 98, 195 F.2d 29; Buford v. Tobacco Growers Co-Op. Assn., 4 Cir., N. C., 42 F.2d 791, 792 (Attorney fees allowed for procuring appointment of a receiver for mismanaged association, to the benefit of the association. The court held that if a benefit was produced the allowance was proper "even though a large percentage of the members may have opposed the suit. In other words, if the class of persons among whom the fund will be distributed has been benefited by the suit, it makes no difference that some of them may have contested it; for it is the benefit conferred, and not the fact that all the beneficiaries may have agreed as to what was beneficial, that entitles counsel to compensation."); Fiske v. Wallace, 8 Cir., Mo., 117 F.2d 149; Monroe v. Winn, 19 Wash.2d 462, 142 P.2d 1022, 1024; State Life Ins. Co. v. Board of Education, 401 Ill. 252, 258, 81 N.E.2d 877, 880 (The court said: "Usually the claim for solicitor's fees

comes in representative suits, but such a rule is not universal.") ; Paris v. Metropolitan L. Ins. Co., 94 F. Supp. 792, 795 (The services resulted in a retroactive increase in wages of employees of defendant to the amount of $792,318.19 placed in the hands of an escrow agent. The fee allowed was $150,000. The services were described as extensive, high in quality and highly success-ful. The court said: "The petitioner's application certainly does not fall beyond the very broad boundaries indicated by the Supreme Court in the cited cases." —Sprague v. Ticonic Nat. Bk., 307 U. S. 161, 59 S. Ct. 777, 83 L. Ed. 1184, and others.) ; Universal Constr. Co. v. Gore (1951) Fla., 51 So.2d 429; In re Allen v. Chase Nat. Bk., 180 Misc. 259, 40 N. Y. S.2d 245 (The court held that whether one sues representatively or formally makes a fund available to others is a relevant circumstance in making the fund liable for his costs, but the formalities of litiga-tion do not touch upon the power of equity to do justice between a party and the beneficiaries of his litigation as regards the allowance of costs) ; Mann v. Luke, supra, 82 N. Y. S.2d 725, 733 (The court said: "The authorities are clear that liabilities ac-crued on corporate books may be cancelled through the instru-mentality of a derivative stockholders' action [citing cases], and that cancellation of such liabilities by judicial decree is equiv-alent to the creation of cash benefits.") ; Shanik v. Empire Power Corp., 58 N. Y. S.2d 176, 181 (recovery of $4,032,965.96), af-firmed 296 N. Y. 664, 69 N.E.2d 818 (and sent back for disposal of fees, etc.) ; Boyd v. Bell, supra, 64 F. Supp. 22, 23 ("The right of the stockholder to bring a derivative action to right wrongs allegedly caused by directors or officers of a corporation of which he is a stockholder is not a creature of statute, and it has existed independently of any statute for a great many years.").

The contention of defendant that intervenors and Scott brought action only for their own benefit, or, at most, only for the benefit of the holders of unsurrendered preferred stock certificates is an unwarranted construction of their pleadings. It is putting language into the pleadings that is not there. The pleading of the intervenors says nothing about unsurrendered certificates. It alleged that all of their stock was "properly

issued and legally sold" and that it was entitled to priority over all other stock of the corporation except such preferred stock held by persons situated similarly to them.

John Hale drew that pleading. What is his interpretation of it? He testified: "I alleged that our stock was not void, not only for the intervenors but all others similarly situated, because we had purchased it from the company at its par value. Shortly after that, I discovered that General Havner had no intention of asking to have stock of that kind declared void. His action was intended to be against the Bechtels and against the holders of stock sold by Langley & Company, who were New York brokers and who, as we then believed, purchased—obtained—the stock for less than its actual value."

The prayer of their pleading was not the same as the prayer of the relator. Their prayer asked for a receiver for the corporation, but not for its dissolution and the cancellation of its permit to operate. It asked that all stock illegally issued be decreed to be void, and that the stock of the intervening defendants and of all other stockholders similarly situated be declared to be a valid and binding obligation of the defendant.

In the amendment to their answer they alleged that their stock was legally issued after payment therefor in full at par value.

The contention of defendant that intervenors brought action only for their own benefit and that of the holders of unsurrendered preferred stock is without support. It was filed by them for and in behalf of the corporation and of all holders of valid and fully-paid stock, both surrendered and unsurrendered. It is fair to say that such stock comprised all of the outstanding stock except the 39,468 shares of new common stock held by the Bechtels, and that the intervention was not adverse to said shareholders and to the corporation, but was for their benefit.

It is certain that Judge Graven did not consider that the intervention of Miss Thatcher and her grandmother was for their own benefit and the benefit of only those who had not surrendered their old stock for the new common stock, for in his oral discussion of his contemplated determination of the case he repeatedly referred to the 4000 stockholders who owned

small lots of preferred stock, and in his written findings of fact he stated that the issuance of 39,468 shares of stock to the Bechtel trustees "was unjust and unfair and inequitable to the *former preferred stockholders represented in this case by the intervenors, Ila Faye Thatcher and Nancy Rosseau.*" (Italics ours.) The court referred to those preferred stockholders who *had* surrendered their stock, and not to those who *had not.*

The contention of defendant is without merit.

The substituted answer of the defendant Scott, which has been referred to as in effect a cross-petition, is somewhat lacking in clarity. It alleges that he was deceived into exchanging seven shares of preferred stock for which he had paid full par value in cash to the corporation and which was entitled to priority over all other stock issued by the corporation except like stock held by persons situated similarly to himself. It also alleges that approximately $600,000 of the $15 par value new common stock had been issued for worthless old common stock. The prayer of the pleading is that the new common stock issued to him be held void and that his old preferred stock be returned to him; that the court decree all illegally issued stock to be void and that a receiver be appointed. It does not ask for the dissolution of the corporation. The trial court (Judge Graven) in both its tentative oral and written findings of fact and conclusions of law did not refer to Elery Scott as the representative of the other stockholders, but mentioned the intervenors as such. There is support for holding that Scott's pleading was filed in behalf of all those holding stock issued to them for which they paid par value and not, as defendant contends, for only those who had not surrendered their preferred stock. He had surrendered his.

██ · The defendant stresses the fact that the intervenors in their intervening answer, and Scott in his pleading, did not designate them as stockholders' derivative actions brought for the benefit of the corporation, or expressly so allege therein. It is not essential that either of these matters be done to institute a derivative action. The nature of the action is determined by the surrounding circumstances, facts alleged, and the prayer of the pleading. The authority of the court to grant the relief

to avoid an injustice is inherent in the broad discretionary power of equity. In Sprague v. Ticonic Nat. Bk., supra, 307 U. S. 161, 59 S. Ct. 777, 83 L. Ed. 1184, the plaintiff deposited money in the defendant bank in trusts in which she and others had a beneficial interest. The defendant set aside and earmarked certain bonds as security for the funds. Later another bank took over the assets of the defendant and thereafter both banks went into receivership, and plaintiff by suit had a lien impressed on the bonds and their proceeds for the trust deposit. She then filed petition for the allowance of counsel fees and expense incident to establishing the bonds as security for her trust funds. There were fourteen other trusts in situations like her own. She alleged in her petition that the decision she had procured, under the rule of *stare decisis,* gave the same protection to the other fourteen trusts, and she prayed the court for reasonable counsel fees and litigation expenses to be paid her out of the proceeds of all of the bonds. The district court denied her petition and the Circuit Court of Appeals affirmed, on the grounds that there was no authority to grant the petition. On appeal, the United States Supreme Court, speaking through Mr. Justice Frankfurter, reversed the lower courts. After reviewing briefly the cognizance of the federal courts to the long-recognized powers of equity in the allowance of litigation expenses, technically known as costs "as between solicitor and client", the court said at pages 165, 166, 167 of 307 U. S., page 779 of 59 S. Ct., pages 1186, 1187 of 83 L. Ed.:

"To be sure, the usual case is one where through the complainant's efforts a fund is recovered in which others share. Sometimes the complainant avowedly sues for the common interest while in others his litigation results in a fund for a group though he did not profess to be their representative. The present case presents a variant of the latter situation. In her main suit the petitioner neither avowed herself to be the representative of a class nor did she automatically establish a fund in which others could participate. But in view of the consequences of *stare decisis,* the petitioner by establishing her claim necessarily established the claims of fourteen other trusts pertaining to the same bonds.

"That the party in a situation like the present neither purported to sue for a class nor formally established by litigation a fund available to the class, does not seem to be a differentiating factor so far as it affects the source of the recognized power of equity to grant reimbursements of the kind for which the petitioner in this case appealed to the chancellor's discretion. Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation. Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation—the absence of an avowed class suit or the creation of a fund, as it were, through *stare decisis* rather than through a decree—hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation. As in much else that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility. In the actual exercise of the power to award costs 'as between solicitor and client' all sorts of practical distinctions have been taken in distributing the cost of the burden of the litigation."

The applicants in the appeal before us have a much stronger case on the facts than had the plaintiff in the Sprague v. Ticonic National Bank case, supra. For the intervenors expressly alleged that they were intervening in behalf of other stockholders with respect to matters bringing benefits to them derived through the corporation, and Elery Scott inferentially did so, and they did bring forth tangible benefits by canceling corporate obligations and restoring corporate assets.

A similar holding is found in Wood v. Union Gospel Church Bldg. Assn., supra, 63 Wis. 9, 15, 22 N.W. 756, 758, a suit to obtain the cancellation of thirty-nine certificates of unlawfully issued stock, in which the court said: "The relief demanded, if granted, necessarily inures to the benefit of all such other stock-

holders as well as the plaintiff. While, therefore, the complaint contains no formal statement that the action is brought for the benefit of the other original stockholders, we are of the opinion that it was brought in their behalf, and that any of them may become parties plaintiff thereto upon due application."

It is just as patent in the pleading and action under consideration, which pray for the ascertainment of and the cancellation of any unlawfully issued or invalid stock, that its cancellation will benefit the corporation.

In Potter v. Walker, supra, 252 App. Div. 244, 245, 293 N. Y. S. 161, 163, affirmed in 276 N. Y. 15, 11 N.E.2d 335, plaintiff individually and as a stockholder of the Pan American Petroleum & Transport Company brought suit in behalf of himself and all other stockholders similarly situated and in the right of the company against Walker and others. The court said: "His action is a representative one, whether so stated or not. (Grant v. Greene Consolidated Copper Co., 169 App. Div. 206 [154 N. Y. S. 596]; aff'd., 223 N. Y. 655 [119 N.E. 1046].) While plaintiff as a stockholder has the right to invoke the aid of a court of equity, any cause of action he might have is a derivative one and for the benefit of the corporation. It has been well stated that in a representative derivative action a stockholder who brings the same is not the real plaintiff, but merely the 'instigator' of the action. (Holmes v. Camp, 180 App. Div. 409, 412 [167 N. Y. S. 840].)"

As stated in the heading of this Division II, the defendant urges as a defense to the claims of applicants that there was no privity of contract between the intervenors and Scott and the corporation or the stockholders generally. This contention was answered by this court in Ontjes v. MacNider, 234 Iowa 208, 215–217, 12 N.W.2d 284, supra. We there said (page 215): "Appellant [defendant] contends that the relationship of attorney and client is dependent upon contract, express or implied, and that since Ontjes, as attorney for himself, could not contract with himself, there was no such relationship here. But in a stockholders' suit such as this the relationship is superimposed by law and is not based on contract. * * * [page 217] The law is well settled that there is no contractual basis for the

award of attorney's fees or expenses to Ontjes. The contention of appellant, based upon the proposition that such right of Ontjes is dependent upon a contract, has no merit." Cited in support thereof is Graham v. Dubuque Specialty Machine Works, supra, 138 Iowa 456, 463, where it is stated (page 216): " 'But no more than reasonable expenses, including attorney's fees, may be exacted. * * * The right to the recovery of costs at all is contingent on success in the suit. If the action is successful, the plaintiffs may recover for, or have taxed, their attorney's fees; if unsuccessful, they may not.' " Also cited in Ontjes v. MacNider, in support of these universally recognized principles of law, are 49 A. L. R. 1190 and Hutchinson Box Board & Paper Co. v. Van Horn, 8 Cir., Kan., 299 F. 424, 430, which states: " 'The theory upon which the attorney's fees are allowed is that, if the action is successful and the corporation has been benefited, it should pay the reasonable value of the services rendered it.' "

We find no merit in any of the propositions contended for by defendant and set out in the heading of this Division.

III. Defendant urges as defenses that: "There was no recovery for or on behalf of the corporation or for its benefit, and its assets were not increased or preserved as a result of it; that the cancellation of the Bechtel stock with any resulting benefit to the stockholders was merely an incident of litigation, the object of which, if attained, would have been detrimental to those stockholders."

As a result of the reclassification of the capital stock of the defendant on and after August 1, 1938, it had an authorized capital of 360,000 shares of which 358,799.1 shares were outstanding. Of these, 39,468 shares were the result of the exchange or conversion of 100,000 shares of old common stock, and 319,311.1 shares were the result of the exchange or conversion of the more than 80,000 shares of old preferred stock, so that after the reclassification there was but one class of stock, the par value of which was fixed at $15 a share. This made the dollar value of the 358,799.1 shares of outstanding capital stock $5,381,986.50. This continued as the capital structure of the company until January 21, 1944, when Judge Graven canceled the certifi-

cates for the 39,468 shares of stock held by the Bechtels. They refused to accept the decision and appealed, and continued to hold the stock, so that the outstanding stock of the company, as shown by its books, remained at 358,799.1 shares. During the pendency of the appeal, and on June 15, 1946, the company began paying dividends on its new common stock, and, as here-inbefore stated the dividends on the Bechtel stock were held by the company in trust for them until they amounted to $124,320.20 on May 29, 1949, when certiorari was denied by the Supreme Court of the United States.

The company then returned the trusteed dividends to its general account or to its surplus account. Presumably the Bech-tels returned their certificates of stock to the company for cancellation, although the record on the appeal does not show it. But the company's balance sheet, on the liability side, for May 31, 1949, showed the authorized capital of the company still 360,000 shares—as it should be, since the court's decision did not affect it—the outstanding capital at 319,331.1, and its par value or book value still $5,381,986.50.

Mr. Welch, defendant's assistant treasurer, testifying as to these entries said: "The number of shares shown outstanding is different but we left the same value on the books, although the total number of shares outstanding is less. The equity of shares increased that much, the difference, increased that much in value."

It was proper bookkeeping to leave the stock value at $5,381,-986.50 as the real assets of the company, its property, money, etc. had been in no way or amount diminished by the court's decision. The company had been benefited and its financial position and structure much improved by the litigation. Before it was begun the company had outstanding 39,468 shares of $15 par stock, creating a capital stock liability of $592,020, for which it had received no consideration—not anything of value. It had taken $124,320.20 out of its surplus account and put it in trust for the Bechtels.

After the litigation and as a result of it the Bechtel stock certificates were canceled, its capital stock liability of $592,020 was extinguished, the 39,468 shares of stock were back in its

treasury, and $124,320.20 were restored to its surplus account free from any trust lien or encumbrance. To say, as the company does, that it was not benefited, is to state that which has no reasonable basis, and is contrary to the obvious facts.

Whether the Bechtel stock which was returned to the company shall be considered as treasury stock or as unissued authorized stock presents somewhat of a problem. By statute when corporate stock is sold the company must receive its par value in money or property, otherwise it is unlawfully issued. Nothing was received for the Bechtel stock. It should never have been issued, and on its return to the company it could be said with some reason that it should be considered as unissued authorized stock. As such stock the company would have 39,468 shares of stock for which it would receive $15 a share, if and when issued. Welch testified that since the decision of the United States Supreme Court the 39,468 shares had not been recognized by the company.

Treasury stock, as distinguished from unissued stock, is corporate stock which has been subscribed and paid for, but has thereafter been reacquired by the corporation by purchase, donation, forfeiture or other means. It becomes personal property of the company and part of its assets, and it may be sold for cash or credit, for par or for market value, or upon any terms that a stockholder could sell. Certificates in regular form may be issued therefor to the purchasers. Having been once issued it generally is not regarded as unissued authorized stock in the proper sense. 18 C. J. S., Corporations, sections 210, 212; 13 Am. Jur., Corporations, section 189; Bondurant v. Raven Coal Co., Mo. App., 25 S.W.2d 566, 574, 575; Sherman v. Shaughnessy, 148 Mo. App. 679, 129 S.W. 245, 248, 249; Fry v. Helvering, 2 Cir., 128 F.2d 737; Robinson v. Bradley, Tex. Civ. App., 141 S.W.2d 425, 427; Maynard v. Doe Run Lead Co., 305 Mo. 356, 265 S.W. 94; Faris v. Beck, 74 Colo. 480, 222 P. 652; Kemp v. Levinger, 162 Va. 685, 174 S.E. 820; Cooperative Finance Corp. v. Killoran, 26 Del. Ch. 436, 24 A.2d 584, 586.

Extinguishing the stock liability at par in the cancellation of the 39,468 shares was equal to a cash payment to the company of $592,020. Adding to this sum the $124,320.20 for dividends

restored would be $716,340.20. If the returned stock be considered as unissued authorized stock which the company may issue at par the company's total benefit would also be $716,340.20.

We think the returned stock can more properly be considered as treasury stock available for sale at par or market value. Its market value on May 29, 1949, the day it was reacquired, was at least $13.50 a share, making its total value at that time, $532,818. The petition for certiorari stated stock value was over $400,000. The returned dividends of $124,320.20 added to $532,818 made the total benefit to the corporation $657,138.20.

The benefit to the company was a direct and definite one. It was a return to it of property that had been wrongfully taken from it. It resulted in an increase of its assets and in a decrease of its financial obligations. The title and ownership of its property was in the corporation and not in its stockholders. The benefits were primarily and directly to the corporation. Of course the litigation was and will be a benefit to the stockholders. It is necessarily so, because in a very real sense the stockholders are the corporation, although they are separate legal entities. But their benefit is derived from the corporation. It is a secondary and indirect benefit. They do not receive the full benefit of the litigation. The corporate expense, upkeep and improvements must first be paid, and the rights of the corporate creditors take priority over the stockholders. They will receive their benefits in increased dividends, increased value of their stock, and an increased share of corporate assets upon distribution. They should and will contribute to any money received by the applicants, but such contribution should, and will, be through the corporation.

Respecting defendant's contention that any resulting benefit was merely an incident of the litigation, whatever that may mean, we disagree. It was the primary object of intervenors and of Scott that all unlawfully issued stock should be decreed void, and the stock which they specifically had in mind, as alleged by Scott, was the Bechtel stock. Its cancellation was a direct and proximate result of their purpose and efforts and not an incident thereof.

It is our conclusion that there is no sound foundation for defendant's proposition that it was not benefited by the services of the applicants.

IV. Defendant asserts that: "The attorneys for plaintiff did not purport to represent the intervenors or Scott until after the entry of judgment, and that the attorneys for the intervenors did not participate in the trial or in the appeal."

The record establishes beyond fair question that Mr. Havner in January 1940 was employed by the intervenors to represent them and to attend to their interests as stockholders of defendant, and to be guided by his own best judgment. Miss Thatcher, her father and grandmother had confidence in him. It was apparent that if there was to be a contest in the courts, and the affairs of the defendant over several years were to be investigated, and the records searched, and the facts and the law briefed, that much effort and time would be expended, and that Mr. Havner would likely need others to assist him. Intervenors consented to this. They had already had some controversy with defendant. It had violated its oral agreement to repurchase their stock at any time it was requested. In fact the record discloses that the demands from others to perform such agreements were so numerous and the company's finances were such that it was unable to keep its promises. Intervenors delivered their stock to Mr. Havner at this time.

John Hale had been consulted by many stockholders who wished some action taken against the defendant. He knew of Mr. Havner's bringing the Weede suit and he consulted him about a stockholders' derivative suit. Later Mr. Havner sent the intervenors to Mr. Hale and he prepared the intervention pleading for them and later amended it. He filed resistance to the defendant's motion to strike these pleadings. In the amendment to the intervening answer he adopted largely the allegations in the Weede suit. In December 1942 Mr. Havner secured Mr. Ontjes, who had a wide experience in stockholders' derivative suits, to assist him in the Weede case and as attorney for the intervenors. In the early part of 1943 Judge Graven was appointed to hear the case. Mr. Havner and Mr. Ontjes presented applications for production of books and papers, and, after some

preliminary proceedings, Judge Graven, his reporter and some of the attorneys for the company, Bechtels and other defendants, with Havner and Ontjes went to the home office of defendant to examine the records. It was an inconvenient task conducted with some interruptions for the convenience of the court and the attorneys to attend to other matters.

Mr. Hale told Mr. Havner and Mr. Ontjes that he would help in every way that he could but that he would prefer not to participate in the active trial work. He had filed intervenors' answer in February 1940, the amendment in December 1942, the resistance to the motion to strike the intervention pleadings on January 19, 1943, and had appeared in the submission of the matter before Judge Graven on January 27, 1943. He did not participate in the production proceedings at Centerville, which terminated in August 1943.

It appears without dispute that on March 3, 1943, Elery Scott, for whom and other defendants a joint answer had been filed by Cross & Hamill, employed the Havner firm and Ontjes to file a substituted answer for him and to appear for him in the trial. They prepared the answer, which he signed pro se, and they filed it and agreed to look after his interests in the trial. In April 1943 he presented a written request to defendant that H. M. Havner and F. A. Ontjes be permitted to examine its books and records.

When the trial opened September 1, 1943, the court in giving the appearances to the reporter stated that the Cook and Cross firms appeared for Mr. Scott, and Mr. Cook then told the court that Mr. Scott had filed an independent answer pro se "after those appearances had been entered, and I assume that by that answer he withdrew the representation of Cross & Hamill and the rest of us for him." The court mentioned the appearance of Mr. Hale's firm for the intervenors and asked if any of the firm were present. Mr. Havner said: "I have not seen them; I know that Mr. Hale is up on the Canadian border trying to get rid of some hay fever." On the court's asking if Mr. Hale contemplated being present, Mr. Ontjes said: "I don't think he does", and Mr. Havner said: "I think this situation shows in the record and appears that so far as intervenors are con-

cerned, as their petition now stands as amended, their allegations are practically identical with the allegations of the plaintiff."

Mr. Hale took no part in the trial and was in the courtroom during the trial very little. There was evidence that he had numerous conferences with Havner, Ontjes and Morgan. The taking of testimony continued past the middle of December. Inasmuch as the pleadings of the intervenors and of Mr. Scott by express reference adopted the allegations of the Weede petition, most of the evidence was pertinent to all parties. Mr. Cook put in most of the testimony for the company and its officers and the Bechtels. Mr. Ontjes and Mr. Havner put in all of the testimony for the other side. All testimony introduced bearing upon the 4000 or more small stockholders, whom Judge Graven said were represented by the intervenors, was offered and introduced by Havner and Ontjes. The court found for them on that testimony. The arguments continued for several days, and the applicants on this appeal contend that all matters pertaining to the Weede case and to the intervention and Scott's cross-petition were fully argued. It is certain that the trial court found against the State of Iowa ex rel. Weede, and for Scott and the intervenors, and we are convinced that the successful outcome for the latter must have been brought about by the efforts of Mr. Havner and Mr. Ontjes, as attorneys for the intervenors and Scott. Confirmatory of this is the statement made by Judge Graven in his oral findings, to wit: "Now there is another reason why I could invalidate the Bechtel stock, and that is the theory that is argued most strongly by Mr. Ontjes."

Applicants do not claim that Mr. Hale or his firm took part in the trial itself in the district court. They prepared and filed the pleadings for intervenors, entered their appearances in the district court, and resisted a motion, and then had Mr. Havner and Mr. Ontjes represent and protect the interests of the intervenors in the trial of the case. Under Mr. Havner's agreement with Miss Thatcher and her father and Mrs. Rosseau when they delivered their certificates to him and told him to use his best judgment for their protection he obligated himself to give them that service. We find he did so.

On April 1, 1944, Clark, Pryor, Hale & Plock withdrew

their appearance for the intervenors, and on August 8, 1944, F. A. Ontjes, H. M. Havner and V. H. Morgan filed their appearance for the intervenors and thereafter represented them and Elery Scott in all appellate proceedings.

V. Defendant contends that: "The claim for attorneys' fees is barred by laches in that it was not asserted for more than five years after the judgment was entered, during which time the position of the corporation was changed in the reliance on the final judgment."

Neither party can be charged with unduly prolonging the litigation or of unnecessary delay. The issues involved occurred over a period of several years, requiring the examination of many corporate records and transactions. Preparations for the trial took many months. The production proceeding took over four months and the trial a longer time. There was over a large truck load of exhibits. The reporter's transcript contained almost 3000 pages. The printed appellate matter contained hundreds of pages. The transcript in the United States Supreme Court contained 600 pages. There would have been no appeal to the Iowa Supreme Court had not the defendants appealed. It was they, also, who petitioned the United States Supreme Court for a writ of certiorari. The writ was denied on May 29, 1949. Any application for attorneys' fees would have been premature before that time. The application for fees and expenses was filed on February 8, 1950, which was not untimely. Not only is the element of time lacking, but there is no showing of any prejudice to defendant by reason of not making the application for fees and expenses until February 8, 1950. There is no evidence that the operation of the corporation and the conduct of its business was prejudiced in any way. Not only was the defendant not injured by the litigation but the record overwhelmingly establishes that it was greatly benefited by it.

VI. Defendant contends that the allegations in the petition of intervention and the pleading of Elery Scott were adverse to the interests of 97% of the stockholders.

This statement is not supported by the record. The purpose of the intervention and the pleading of Mr. Scott was to have a court determination of which stock was unlawfully issued. Their preferred stock was lawfully issued, in that it was bought

and paid for at par value. There were many others who held valid stock bought in the same way and were in the same situation as they. In fact according to the record and Judge Graven's findings there were over 4000 of such stockholders. Miss Thatcher and Mrs. Rosseau and Elery Scott had heard reports that the Bechtel stock had not been so acquired and that the corporation and the preferred stockholders had thereby been injured. For that reason, as representatives and in behalf of the corporation and its stockholders situated as they were, they filed their pleadings. Instead of being adverse to 97% of the stockholders and representing 3% of the stockholders they represented all of them but the Bechtels. Praying for a decree determining the valid stock and canceling the unlawfully issued stock could not be adverse to the holder of valid stock and was adverse to no stockholders but the Bechtels.

The fact that they prayed for a receiver was not necessarily adverse to any stockholder. Receivers are usually asked for and appointed for protection and not destruction. As said by Judge Graven in Liken v. Shaffer, 64 F. Supp. 432, 439, a very thorough and well-considered opinion: "It is well settled that the appointment of a receiver does not result in the dissolution of a corporation. 19 C. J. S., Corporations, §1493." The intervenors and Mr. Scott and the decree of the court were adverse to no holder of stock but the Bechtels, and were of great benefit to the corporation and all other stockholders.

VII. Another proposition relied upon by the defendant for affirmance is: "The special appearance of the defendant should have been sustained and the judgment of dismissal should be affirmed, even if the original action is held to be one in which the allowance of fees and expenses might have been made before the judgment became a finality."

The allegations of the special appearance are set out herein. It was rightly overruled by Judge Patterson on June 8, 1950. The court unquestionably had jurisdiction. There is no statutory provision or rule of procedure or practice in Iowa, or elsewhere, that we have discovered, fixing the time or manner of the filing of applications or actions for the recovery of claims such as this one, for what are commonly designated "costs as between solicitor

and client." Cases show them to have been claimed in the original suit, and at various times in the later progress of the action, and by independent actions at the same term of court, or at later terms. In a discussion of the matter in Sprague v. Ticonic Nat. Bk., supra, 307 U. S. 161, 168–170, 59 S. Ct. 777, 781, 83 L. Ed. 1184, 1188, 1189, the court said:

"Certainly the claim for 'as between solicitor and client' costs was not directly in issue in the original proceedings by Sprague. It was neither before the Circuit Court of Appeals nor before this Court. * * * They [these costs] are not of a routine character like ordinary taxable costs; they are contingent upon the exigencies of equitable litigation, the final disposition of which in its entire process including appeal places such a claim in much better perspective than it would have at an earlier stage. Such are the considerations which underlay the decision in Internal Improvement Fund v. Greenough, 105 U. S. 527, 26 L. Ed. 1157, in holding that an order allowing costs 'as between solicitor and client' was a final judgment for purposes of appeal because 'the inquiry was a collateral one, having a distinct and independent character.' We, therefore, hold that the issue in the instant case is sufficiently different from that presented by the ordinary questions regarding taxable costs that it was impliedly covered neither by the original decree nor by the mandates, and that neither constituted a bar to the disposal of the petition below on its merits.

"Finally, we must notice the separate ground taken by the Circuit Court of Appeals on the basis of what it deemed the requirements of terms of court. The new Rules of Civil Procedure have rendered anachronistic the technical niceties pertaining to terms of court as to both law and equity, but the ruling of the District Court here in question was made prior to the operation of the new Rules. Since we view the petition for reimbursement as an independent proceeding supplemental to the original proceeding and not a request for a modification of the original decree, the suggestion of the Circuit Court of Appeals—that it came after the end of the term at which the main decree was entered and therefore too late—falls."

No purpose could have been served in making the application at a time when the litigation had not progressed to the place where the final determination had been reached that the applicants were successful in the action, since success is an essential for recovery in an application of this kind. The rule of the Sprague case is approved in Sears, Roebuck & Co. v. Nelson, 230 Iowa 936, 940, 299 N.W. 398, 400.

For like authority see Goodwin v. Castleton, 19 Wash.2d 748, 144 P.2d 725, 150 A. L. R. 859; Drivas v. Lekas, 182 Misc. 567, 48 N. Y. S.2d 785; Ontjes v. MacNider, supra, 234 Iowa 208, 12 N.W.2d 284; Folts v. Globe Life Ins. Co., 119 Neb. 143, 227 N.W. 455; 30 C. J. S., Equity, section 425, page 835; Graham v. Dubuque Specialty Machine Works, supra, 138 Iowa 456, 114 N.W. 619, 15 L. R. A., N. S., 729.

VIII. Another defense urged is that between January 21, 1944, when the decree of the trial court was entered, and May 29, 1949, when certiorari was denied, there were over 3800 transfers of stock in the company and that between said dates there had been much relinquishing and acquisition of stock resulting in changes in the personnel of the stockholders.

The proposition is without force. It was urged in Hooker, Corser & Mitchell Co. v. Hooker, 88 Vt. 335, 348, 92 A. 443, 448, where the court said: "It was no objection to the maintenance of this suit that the stockholders had changed since the alleged wrongdoing and therefore the recovery would inure to the benefit of some who were not stockholders at the time of the occurrences complained of. Such is frequently, if not usually, the case. The mere fact of a change in the stockholders is no defense to a suit like this."

An action of this kind is for the benefit of the corporation, a legal entity whose rights and obligations do not change with the changes among its stockholders.

It is fair to assume that in a company such as the General Motors Corporation there is a very great change in the personnel of its shareholders even in a short period of time. Yet in Winkelman v. General Motors Corp., 44 F. Supp. 960,970, in a derivative suit there was a settlement with the complainant in which the corporation was paid $4,500,000 and counsel fees and expenses of $795,000 were allowed.

The hearing upon this application was had in the district court and it was submitted on evidence and argument from each side. Full opportunity was given all parties to offer any proper evidence. The district court made written findings of fact and conclusions of law, and on December 8, 1950, there was filed a decree rendered on November 10, 1950, denying any allowance to any of the applicants for attorneys' fees for services rendered or for expenses in connection with their services.

It is our conclusion, after diligent study of the large record, printed and typewritten, and exhibits, and research in the pertinent law, that the trial court erred in its findings of fact, conclusions of law, adverse to applicants, and in its decree denying any allowances to them for fees and expenses, and entering judgment against them for costs.

 The appeal is before us for trial de novo. It is our conclusion that the applicants have established their right to a recovery. There remains but one matter for determination and that is the amount of recovery for attorneys' fees and expenses.

The printed and typewritten record in the appeal is over 800 pages. The United States Supreme Court briefs and arguments and transcript are 700 pages. The printed record in the case tried before Judge Graven is over 1000 pages, with a typewritten transcript of 3200 pages. The Supreme Court printed record in 231 Iowa 784 was also introduced. The court has studied this large record and has concluded that it will be in the interest of justice and to the best interest of all parties concerned to render final decree of the case and to determine the amount of recovery.

In the trial in the district court the applicants stipulated that any award of fees and expenses should be made to the applicants in one lump sum and not individually. We will make our finding accordingly.

 The measure by which to determine the amount of the attorneys' fees is the reasonable value of those services. Several factors must be considered in ascertaining this value. Some of them are stated in Graham v. Dubuque Specialty Machine Works, supra, 138 Iowa 456, 463, 114 N.W. 619, 622, 15 L. R. A., N. S., 729, to wit: "In estimating the value of services rendered by plaintiff, it is proper to take into account the time necessarily

employed in and the success of the litigation [cases]; the amount or values involved [case]; and recovered [case]; the ability, learning, and experience of the attorney, and his standing in the profession [case]." Numerous authorities could be cited to like effect. We will cite but a few: Perrine v. Pennroad Corp., supra, 29 Del. Ch. 423, 51 A.2d 327, 343. (This was a stockholders' derivative suit and the court mentioned the attorney's long experience and skill in this type of litigation); Swacker v. Pennroad Corp., Del. Sup. Ct., 57 A.2d 63, 69; Ontjes v. MacNider, supra, 234 Iowa 208, 218, 219, 12 N.W.2d 284, 290 (The court said: "It is difficult to be specific with such a mass of facts as here presented. The fee allowed seems large. But the trial * * * consumed seven months. There were over four thousand exhibits, over six thousand pages of transcript. Months of preparation preceded the trial. Such a trial is something of an ordeal. Even when successful, it can raise havoc with a lawyer's practice. When it is unsuccessful, it can be disastrous. * * * 'In fixing the amount of such compensation the court will allow an amount which under all the circumstances it considers to represent the fair value of the services.' ") (The recovery was $103,892.19. The attorneys were allowed $43,500.) Hornstein, 39 Col. L. Rev. 810 et seq.; In re Estate of Dehner, 230 Iowa 490, 494, 298 N.W. 656, 143 A. L. R. 669, annotation 672–967 (court is not bound by expert testimony); Van Gorden v. Lunt, 234 Iowa 832, 840, 13 N.W.2d 341, 345 ("Courts are not absolutely bound by expert evidence on the value of legal services. The court itself is an expert as to what are reasonable attorney's fees. In re Estate of Chismore, 194 Iowa 300, 304, 189 N.W. 770"); Wilson v. Fleming, 239 Iowa 718, 736, 31 N.W.2d 393, 402 ("The court was not required to hear testimony on the motion [to tax attorney fee]. * * * The matter was within its discretion. * * * The case was important. A number of difficult law questions were involved. Considerable preparation was required. Plaintiffs' attorneys were opposed by counsel of much ability. The results obtained were satisfactory.").

The attorneys in the appeal at bar, on both sides, were able in every respect of their profession. The action was tried very well on each side. In Hughson v. Iowa Electric Light & Power Co., tried in the United States District Court before Judge

Graven, the plaintiff stockholders were represented by John Hale. Mr. Ontjes had much experience in this kind of litigation in Iowa, Delaware and elsewhere. Mr. Havner was a lawyer of wide experience, as was also Mr. Morgan.

In 43 Columbia Law Review 275, is an article entitled "A Study in Trial Tactics: Derivative Stockholders' Suits", by Mortimer Hays, an experienced lawyer·in this particular litigation. He states at page 279: "Experience in the litigation of stockholders' suits has resulted in the evolution of techniques which in many respects are quite different from those applicable in the trial of the ordinary action. This is in part due to the fact that in litigations of this type the basic proof must come from documents and records in the control and possession of the defendants themselves, and, in so far as it is not established by such records, evidence must come from the management which is being called upon to account. This fundamental distinction between the ordinary litigation, in which at least a *prima facie* case may be made out by counsel through friendly and often interested witnesses, and the stockholders' suit, where the plaintiff must proceed by means of hostile witnesses, dictates an approach to the preparation and presentation of these suits which is *sui generis.*"

The above quotation is quite apropos in this case. A stockholders' derivative action is one in which the corporation should take a strictly neutral part. Slutzker v. Rieber, 132 N. J. Eq. 412, 28 A.2d 528. The corporation should not use its funds in behalf of those who have despoiled it. But in this case the Utilities Company and the Bechtels employed the same attorneys. In the brief and argument of the Utilities Company (Exhibit J–5, pages 135, 136) prepared by said attorneys it is "most seriously urged" that: "All of the shares into which the original preferred *and common stock* was transmuted *were and are valid.*" (Italics ours.) In other words, this statement is that the 39,468 shares of Bechtel stock which Judge Graven regarded as the result of criminal participation were nevertheless valid. This situation added much to the burden of the applicants in the prosecution of the litigation.

Thomas J. Guthrie, almost fifty years in the practice, an able lawyer in Des Moines, a former District Judge, experienced

in the trial of important cases, as a witness for applicants, in answer to a hypothetical question, stated that the services of Mr. Havner and Mr. Ontjes in the cases as noted in the question would be worth $75 a day for trial in the district court, $100 a day for preparation of the record in the Iowa Supreme Court and trial there, and for preparation, presentation and trial in the Supreme Court of the United States would be $150 a day.

John Hale, admitted to the bar in 1926, an experienced lawyer in important litigation, in answer to a hypothetical question as to the value of the applicants services said: "I would base my answer largely upon the result which was obtained, rather benefit to the stockholders. In this case it constituted a saving to the corporation and the stockholders; considering also the caliber of the counsel involved on both sides and minimizing the time element, it would be my opinion that the actual expense of counsel, plus 25% of the amount recovered or saved would be a fair fee, not calculated on a contingent basis, but on a reasonable basis. Mostly on the results obtained, and with studies that I made with respect to fees allowed by courts in cases similar to this."

F. A. Ontjes named important cases involving large amounts, some of them derivative and class cases in which he had participated, with citations of the reports. He testified that in fixing a proper fee the amount involved is a very important factor, as is the amount of time spent, but the amount of benefit—the amount of recovery—is the most important thing in this lawsuit, "in my judgment, $200,000 would be a reasonable fee and would not be more than what ought to be paid."

David G. Bleakley, of Cedar Rapids, in the practice of law since 1926, an able lawyer experienced in the trial of derivative stockholders' suits testified that in his opinion reasonable compensation for the attorneys in the litigation under consideration would be $200,000.

The defendants offered no testimony as to the value of the services of the applicants-attorneys.

At the close of his oral discussion of the decision he would make in the case, Judge Graven said: "Now I am going over the record with Mr. Tait [court reporter] as to how much time

was taken with the various witnesses, and make an apportionment of the costs." In the decree the court apportioned the costs 60% to be paid by J. B. Weede and 40% by Martha R. Bechtel. From our examination of the record and transcript of testimony in the district court we find this is probably as fair an approximation of the costs as can be made, and by analogy is probably a fair measure of the time and services and disbursements used by the applicants-attorneys in behalf of the plaintiff and in behalf of the intervenors and Scott, that is, 60% for the plaintiff and 40% for the latter.

 But considering the record as a whole, including the appellate proceedings in the Iowa Supreme Court, with the rehearing, where a much greater part of the services and time was devoted to the cause of the intervenors and Scott, and considering the certiorari proceedings in the United States Supreme Court where 100% of the services and time was in behalf of the intervenors and Scott, it is our judgment that with respect to the disbursement throughout the litigation and in all courts, the applicants should be reimbursed for 50% of all their expenses; and that in consideration of the results obtained in the restoration of property to the corporation and the benefits received by it the applicants are entitled to receive 65% of what is a reasonable attorney's fee for the entire services performed by them, in behalf of intervenors and Scott for the benefit of the corporation.

The total benefit received by the Utilities Company as hereinbefore stated is $657,138.20. A fair and reasonable attorney's fee for procuring said benefit in our judgment is 25% thereof or $164,284.55 of which the applicants are entitled to 65% thereof or $106,784.96.

As bearing upon the fair and reasonable attorney's fee as stated just above, the record shows in the litigation that Mr. Havner spent 246 days, Mr. Ontjes 230½ days, Mr. Morgan 65½ days, and Mr. Hale 71½ days, or a combined total of 613½ days.

The record shows Mr. Havner expended in the litigation $4062.11, Mr. Ontjes $2465.87 and Mr. Hale $868.29, for a total expense in the litigation of $7396.27, for which they are entitled to reimbursement by the Iowa Southern Utilities Company of

Delaware in the amount of one half thereof, or $3698.14, as a fair and reasonable sum for expenses.

The applicants are therefore awarded and allowed $106,-784.96 as attorneys' fees and $3698.14 as expenses, or a total allowance of $110,483.10.

The judgment and decree is reversed and the cause remanded to the District Court of Jasper County, Iowa, and it is directed to enter judgment and decree on this petition in favor of the applicants and against the Iowa Southern Utilities Company of Delaware for the sum of $110,483.10 with legal interest thereon from February 8, 1950, and for costs.—Reversed and remanded with directions.

All JUSTICES concur.